UNITED STATES, Appellee,

v.

James RUIZ, Captain, U.S.
Air Force, Appellant.

No. 97–0528.
Crim.App. No. 31955.

U.S. Court of Appeals for
the Armed Forces.

Argued March 4, 1998.

Decided Sept. 30, 1998.

For Appellant: *Captain W. Craig Mullen* (argued); *Colonel Douglas H. Kohrt* (on brief); *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Captain Mitchel Neurock* (argued); *Colonel Brenda J. Hollis* and *Lieutenant Colonel Michael J. Breslin* (on brief); *Colonel Theodore J. Fink* and *Major Dixie A. Morrow.*

*Opinion of the Court*

COX, Chief Judge:

In April 1995, appellant was tried at Royal Air Force Lakenheath, United Kingdom, by a general court-martial comprised of members. Contrary to his pleas, he was convicted of separate specifications of adultery and fraternization, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934.[1] The court-martial sentenced him to dismissal and a reprimand. The convening authority approved the sentence, and the Court of Criminal Appeals affirmed. 46 MJ 503 (1997).

We granted review of three issues, one pertaining to the propriety of a government peremptory challenge of a female court member, and two pertaining to alleged misconduct of a different court member. 48 MJ 313 (1997). Finding only the first issue meritorious, we remand for a limited proceeding under *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).

---

1. To the fraternization Charge, which was alleged as having occurred over a period of some 7½ months, appellant pleaded guilty by exceptions and substitutions to a shorter duration. The court-martial, however, found him guilty as charged. A separate Charge and specification alleging conduct unbecoming an officer, in violation of Article 133, UCMJ, 10 USC § 933, was dismissed prior to arraignment.

## I

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO REQUIRE A GENDER-NEUTRAL REASON FOR THE PROSECUTION'S PEREMPTORY CHALLENGE OF THE ONLY FEMALE COURT MEMBER.

### A

After entertaining challenges for cause against prospective court members, the military judge asked assistant trial counsel, who had conducted voir dire for the Government, whether he wanted to use his peremptory challenge. RCM 912(g), Manual for Courts-Martial, United States (1995 ed.). Counsel said he did, and he challenged Major H, the only female member of the panel. Civilian defense counsel immediately objected, asserting that the challenge was "sexually motivated to eliminate the prospect of a female." Civilian counsel cited *United States v. Moore,* 28 MJ 366 (CMA 1989), which was among the earlier of our cases applying *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the military.

In *Batson,* the Supreme Court held that a party alleging that an opponent was exercising peremptory challenges for the purpose of obtaining a racially-biased jury had to make out a prima facie showing of such intent before the party exercising the challenges was required to explain the reasons for the strikes. The prosecutor in *Batson* had used peremptory challenges to strike all four of the African–Americans from the venire, with the result that Batson, an African–American, was tried by an all-white jury.

In *Moore,* we extended the *Batson* rule in the military by adopting a per se rule that "every peremptory challenge by the Government of a member of an accused's race, upon objection, must be explained by trial counsel." 28 MJ at 368 (footnote omitted). We did this "to make it fairer for the accused" because, "[i]n military trials, it would be difficult to show a 'pattern' of discrimination from the use of one peremptory challenge in each court-martial." *Id.*

In the case at bar, upon civilian defense counsel's objection, the military judge asked counsel to expound on his thinking, whereupon counsel asserted:

[T]he prosecution's challenge doesn't fit any of the enumerated factors under [RCM] 912(f) ["*Challenges and removal for cause*"]. I believe that this case for the record [*sic*] that Major [H] is a woman, that she is obviously competent to be a member, and that because this case involves facts which a woman can identify with more clearly than a man, *i.e.,* the treachery of praying with someone's wife and then sleeping with their husband. I don't believe their peremptory challenge is made in good faith. I believe it is to eliminate any type of females on our panel, which there is only one. I believe that it's not founded in any of [sic] way—whatsoever except for the fact removed [sic] the only female on our panel. I believe that if you could analogize that to race in that if they were all Anglo Saxons and there was only one Hispanic, that the issue would be more clear.

Civilian counsel acknowledged, however, that this case was different from *Moore,* at least to the extent that *Moore* involved the use of a peremptory challenge based on race, not gender. The military judge then ruled, "[u]nder the law I'm not going to require the prosecutor to state a position. I'm going to permit the peremptory challenge."

The next morning when court resumed, civilian counsel was again permitted to address the peremptory challenge issue, and he cited *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), as controlling authority on gender-based discrimination. The military judge requested a copy of *J.E.B.,* but apparently none was available at RAF Lakenheath. Defense counsel observed that RAF Mildenhall had the case; but, with the consent of the defense, the military judge elected to "press" on, stating:

I will read the case when you can get it to me, and then we can take up the issue again.

The matter was never mentioned again. Accordingly, the judge's initial decision not to

require the Government to articulate a gender-neutral reason stood throughout the trial. Unbeknownst to the court-martial then, in *J.E.B.*, the Supreme Court had applied the *Batson* rationale to gender a full year earlier. 511 U.S. at 146, 114 S.Ct. 1419.

### B

Appellant raised this same issue before the Court of Criminal Appeals. That court acknowledged that "gender-based discrimination is an impermissible factor in the selection of, or challenge to, court-martial members." Reasoning, however, that our *Moore* per se rule was limited to matters of race, the court concluded that, as in *J.E.B.*, the objecting party "must first make a prima facie showing of intentional discrimination...." 46 MJ at 508. Needless to say, with but a single peremptory challenge available to a party in military practice (RCM 912(g)), the defense here failed to make out a prima facie showing in the Court of Criminal Appeals's view. *Id.* at 509.

In addition, the Court of Criminal Appeals was impressed that a posttrial affidavit supplied by trial counsel expressed "a well reasoned non-gender basis for the peremptory challenge." *Id.* at 509. *Inter alia*, trial counsel had averred:

If the military judge had required us to state a "gender neutral" reason for peremptorily challenging Major [H], I would have instructed [assistant trial counsel] to tell the judge the following: I have been prosecuting Air Force courts-martial on a full or part-time basis for nearly eight years.... Based on my experience prosecuting cases in the past that have included contracting officers as court members, I have concluded that, as a general rule, contracting officers are frequently not the most suitable court members from a prosecutor's perspective. I believe that contracting officers, perhaps because of their frequent and often contentious dealings with legal offices, had a tendency to hold the Government to a higher burden than was required by law. I was satisfied with the background and experience of the remaining court members, so Major [H] was

the most natural member for us to peremptorily challenge in a effort to get the court panel to a more manageable number given our space limitations. If the military judge had required a "gender neutral" reason for the challenge, that is what we would have told him.

### C

At the time the Court of Criminal Appeals adjudicated this case, we had not addressed the issue of gender-based peremptory challenges in courts-martial. Subsequently, in *United States v. Witham*, 47 MJ 297, 298 (1997), we concluded that *J.E.B.* applied to the military and "that gender, like race, is an impermissible basis for the exercise of a peremptory challenge by either the prosecution or the military accused."

Moreover, under *J.E.B.*, it is irrelevant whether the accused and the person challenged are of the same gender, since not only the accused's right is involved, but also the Fourteenth Amendment right of jury members to "[e]qual opportunity to participate in the fair administration of justice." 511 U.S. at 145, 114 S.Ct. 1419; *see also id.* at 140–41, 114 S.Ct. 1419; *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). We recognized this right of the court members in *Witham*, where it was the *defense* that sought to strike peremptorily the only female member of the court-martial, and the Government objected, requesting a gender-neutral explanation. 47 MJ at 302–03. When no such explanation was forthcoming, the military judge denied the peremptory challenge, and we sustained him. 47 MJ at 303. Because the military judge in *Witham* required the explanation at trial, we had no occasion formally to reach the question of whether the *Moore* per se rule extended to cases of potential gender-based discrimination. For the very same reasons as articulated in *Moore*, however, we now hold that it

does.[2] Certainly it is no more difficult for counsel to explain a challenge involving gender than it is for one involving race.

■ In the instant case, therefore, once defense counsel raised the *J.E.B.* issue, the burden to give a gender-neutral explanation shifted to trial counsel. Of course the military judge here did not require trial counsel to give any explanation, "much less the 'clear and reasonably specific explanation of legitimate reasons to challenge' that we endorsed in *Moore, supra* at 369." *United States v. Tulloch*, 47 MJ 283, 288 (1997).

However, at the time of the military judge's ruling and that of the Court of Criminal Appeals, *Witham* had not been decided. And certainly the trial and intermediate appellate judges did not have the benefit of today's opinion, even though it may have been foreshadowed in *Moore*. Under these circumstances, the rulings of the lower courts hardly deserve condemnation, since we have never required judges to be clairvoyant.

Even so, we must decide whether trial counsel's posttrial affidavit has rectified the problem—that is to say, whether it establishes that trial counsel had a gender-neutral basis for challenging Major [H]. Appellant argues that the use of the posttrial affidavit—which was filed by trial counsel some 20 months after the trial—unfairly prejudices him. We are sympathetic with that view, for a posttrial affidavit is invariably an inferior substitute for resolving factual controversies. *See generally United States v. Ginn*, 47 MJ 236 (1997).

For example, on this record, assistant trial counsel conducted all the individual voir dire for the prosecution and asked Major [H] only three or four short and simple questions, to which she unconditionally ⋅ responded and made clear that the ultimate result in a case "depend[ed] on the facts as they come out" and "I hope I have an open mind about the whole thing until you get to the facts in the case, then I will try to judge from there." Assistant trial counsel did not ask her a single question—either directly· or indirectly—concerning her being a contracting officer or the allegedly higher burden of proof to which she might hold the prosecution. Appellant, in short, has not had his day in court on this issue.

Further, a peremptory challenge based on a juror's occupation has been presumed by some to be pretextual on its face. *See* De Riggi, *Appellate Court Guidance on Batson Challenges*, 215 N.Y.L.J. 48 (1996). Other courts have found that supposedly neutral bases for peremptory strikes were pretextual, where the avowed reasons for the strikes were not supported (as here) by the venireman's responses. *Ford v. Norris*, 67 F.3d

2. Virtually all of our cases applying *Batson* and its progeny to the military system involve fact patterns wherein the challenged court member is either the only minority member or is one of a very small percentage of minority members on a particular panel. Our broad pronouncements, such as in *Moore, supra* at 368, that "every peremptory challenge by the Government of a member of an accused's race, upon objection, must be explained by trial counsel," have invariably sprung from such a background.

On closer examination, the logical extensions of such pronouncements are underwhelming. Thus, if the accused was Caucasian and all members of the court-martial were also Caucasian, the prosecutor could literally be required to provide a nonracial explanation for any peremptory challenge. Clearly, this is not what we had in mind when we set out to prohibit discrimination. Moreover, it would be just as illogical to require counsel to state a nonracial ground if the accused was African–American and all members of the panel were also African–American. Whatever the reason for the strike, the remaining court members would still be entirely African–American. A contention, in these circumstances, that there was an intent to discriminate on the basis of race would be patently ridiculous. The same, obviously, applies if all of the court members were Hispanics, women, or any other historically disadvantaged group.

On the other hand, assume that all of the court members but one were members of a particular group, and the remaining court member was Caucasian. A peremptory strike of that member might well be due to race, and would be just as offensive as if the numbers were reversed.

Suffice it to say, our broad pronouncements notwithstanding, there may be circumstances where the exercise of a single peremptory challenge, in the context of the composition of a particular court-martial panel, may not be enough even to raise the spectre of improper motive. Today's case, however, involves a challenge against the only woman in an otherwise all-male panel, so we need not work this theory out any further today.

162, 168 (8th Cir.1995). This disfavor of occupation-based challenges may be more powerful in the military, where the court members have been selected by the convening authority precisely because they are "best qualified for the duty by reason of their age, education, training, experience, length of service, and judicial temperament." RCM 502(a)(1).

Moreover, the court below erroneously implied that the *only* reason the prosecutor gave for striking Major [H] was that "[t]rial counsel, in years of experience as a trial counsel, had formed the opinion that contracting officers tended to hold the Government to a higher standard of proof. Based on this assessment, he decided to challenge Major H." 46 MJ at 509. The court did not mention, and may not even have considered, the first reason asserted by trial counsel for the peremptory challenge.

In paragraph 6 of trial counsel's posttrial affidavit, he states that "the court member box is very small and, especially if there is a large panel, gives the members minimal space to properly hear a case." Yet the record shows that ten court members were in the jury box at the outset of appellant's trial. Two of them were removed for cause, and the defense peremptorily challenged a third member, so there was much more room after the three prospective court members were eliminated from the panel. This proffered basis further beclouds the lower court's conclusion "that the government-provided affidavit ... contains a well reasoned non-gender basis for the peremptory challenge." 46 MJ at 509.

Nevertheless, we can rectify these problems by remanding the case for a limited proceeding under *United States v. DuBay, supra,* just as we did in *Moore.* Indeed, at this *DuBay* hearing, the parties will be in a much better position to represent their respective interests than they were when the issue arose at trial. Today's decision and our recent decisions in *Witham* and *Tulloch,* both *supra,* contain copious guidance in handling *Batson* and *J.E.B.* issues in the military. With these precedents available, the *DuBay* judge will be better equipped than the trial

judge was to make essential findings of fact and apply appropriate legal standards.

## II

WHETHER A NEW TRIAL IS REQUIRED BASED ON A COURT MEMBER'S FAILURE TO DISCLOSE INFORMATION DURING HIS INDIVIDUAL VOIR DIRE.

During individual voir dire, civilian defense counsel asked Lieutenant Colonel H, a prospective court member (not to be confused with Major H of the previous issue), the following specific questions:

CIV DC: Or maybe—testimony is going to come out from Airman [B] [who was involved in the charged adultery and fraternization] perhaps that Captain Ruiz somehow preyed on her. Do you have any preference or any type of a strong feelings [sic] or because of *sexual harassment issues* or things to that effect?

MBR: (Lieutenant Colonel [H]) If there is an issue on sexual harassment, I'm four-square behind that Air Force policy, and that is zero tolerance. The first thing I did when I became the squadron commander was I wrote four policy letters. One of those policy letters specifically addressed sexual harassment. So, if there is an issue here—

(Emphasis added.)

At another point, counsel asked:

CIV DC: ... Colonel, is there anything that I have neglected to ask you that *may impact on your ability to sit as a panel member,* I mean, experience with kids, *a spouse,* cousins, a friend, anything that I haven't delved into that you believe may be relevant because this will be my last opportunity to talk with you unless [you] bring something to our attention? Is there anything that you think disclosure must be made [*sic*] as to any matter?

MBR: (Lieutenant Colonel [H]) I can't think of anything.

(Emphasis added.)

Ultimately, civilian defense counsel challenged Lt Col H for cause, but the military

judge denied it. Counsel later preserved the issue for review by announcing, while peremptorily challenging another officer whose challenge for cause had been denied, that he would have challenged Lt Col H peremptorily if he could have. RCM 912(f)(4).

According to appellant, after his trial was completed his military defense counsel learned from another judge advocate that Lt Col H's wife (also a lieutenant colonel in the Air Force assigned to RAF Lakenheath) had been detailed as a court member in an unrelated court-martial previously held at RAF Lakenheath. During voir dire in that case, she purportedly revealed that, earlier in her career, she had been the victim of sexual harassment by a superior officer. The incident reportedly had a tremendous impact on her because she became very emotional when she recounted it. The military judge supposedly granted the defense's challenge for cause against her on this basis.

Appellant now surmises that the (assumed) sexual harassment experience of Lt Col H's wife "would surely have a big impact" on Lt Col H, and this was probably one of the reasons why he was "four-square" behind the Air Force policy of zero tolerance concerning sexual harassment. Appellant then contends that Lt Col H willfully failed to disclose to the defense—in response to the voir dire questions quoted above—that his wife had been a victim of sexual harassment. This, appellant claims, constituted a substantial misrepresentation, entitling him to a new trial.

■■■ In *United States v. Mack*, 41 MJ 51, 54 (CMA 1994), we observed that voir dire is a critical phase of a court-martial, since it can protect an accused's right to impartial factfinders by uncovering possible biases of members, both known and unknown. *See McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). Voir dire only works when each prospective member fully discloses valid, pertinent information that the judge and the parties can use to assess whether the member is qualified and suited for court-martial duty. In this vein, as *Mack* further observes, we have consistently insist-

ed on a member's honesty during voir dire in order to attain fair member selection. *United States v. Lake*, 36 MJ 317 (CMA 1993); *United States v. Rosser*, 6 MJ 267, 273 (CMA 1979).

■■ In *Mack*, we further observed that in *McDonough*, 464 U.S. at 556, 104 S.Ct. 845, the Supreme Court announced a two-part test for determining if a new trial was required when a juror failed to disclose certain information in response to voir dire:

[A] party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.

■■ In this case, however, Lt Col H himself asked civilian defense counsel "if there is an issue here" involving sexual harassment; and counsel replied, "There is not. You can tell by the charge there." Further, when Lt Col H tried to continue commenting on sexual harassment, it was civilian defense counsel who hastened him to move on to another "issue that I need to talk to you about." Under these circumstances, we are in full accord with the Court of Criminal Appeals's view that there was "no reason why Lt Col H would have divulged information about his wife's experience." 46 MJ at 510. The first prong of the *McDonough* test is not satisfied.

Even if Lt Col H had disclosed the spousal information, it does not appear that it would have provided a valid basis for a challenge for cause. Appellant's relationship with Airman First Class (A1C) B was an amorous one. Appellant was A1C B's squadron commander and the commander of the Lakenheath Honor Guard in which she was a member. According to A1C B, during certain periods they had sexual relations several times per week. Appellant's wife eventually learned about the relationship and moved out of the couple's quarters.

The alleged experience of Lt Col H's wife, on the other hand, bears no similarity at all to the consensual conduct involved here. It would not have provided a valid ground for challenging Lt Col H. *Cf. United States v.*

*Daulton,* 45 MJ 212 (1996); *United States v. Brown,* 34 MJ 105 (CMA 1992). Thus, the second prong of *McDonough* is not satisfied either.

Finally, no evidence was adduced at trial or has been submitted at any time thereafter that shows either actual or implied bias on the part of Lt Col H. Lt Col H's responses to the questions posed to him are illustrative. For example, he assured the court that he was objective and would follow the law no matter what: "I must do [so] even though I personally wouldn't care to do it. I must and I will."; "I'm here to uphold the legality and to uphold those sorts of things.... Whether I like it, is not the issue. Whether it is right, whether it meets the standards or it is the criteria that is set forth by the judge, that's what I will rule."; "I have not heard any evidence. I've heard him talk and now I've heard you talk. I haven't heard the evidence. I haven't heard the instructions from the judge. I have to maintain an open mind until all that's done."

Civilian defense counsel, himself, seemed rather impressed with Lt Col H's responses, at one point conceding, "That's all I can ask for." Even as civilian defense counsel attempted to challenge Lt Col H for cause, he frankly admitted that he could not "pinpoint" or put his finger on anything specific that indicated that Lt Col H would not be a fair and impartial court member. This comports with the lower court's review of the record and its finding of no actual or implied bias that would have required the military judge to grant the challenge for cause.

Accordingly, we conclude that this issue is not meritorious.

### III

#### WHETHER THE CONVENING AUTHORITY ERRED IN NOT ORDERING A POSTTRIAL HEARING.

 After appellant's trial and before the convening authority took final action in the case, civilian defense counsel wrote the convening authority five times requesting that he order a posttrial Article 39(a)[3] session, on two grounds. First, counsel claimed that Lt Col H "lied" to the court or "deliberately concealed" his wife's sexual harassment incident in order to avoid a challenge for cause. Second, he claimed there was

> newly discovered evidence concerning unlawful command influence at UCMJ briefings to Commanders by having the Commander state his opinion as to the appropriate punishment for offenses such as fraternization. This briefing occurred prior to Capt. Ruiz' case.

> Col [H] and his Squadron Section Commander Capt. [N] attended such a meeting. Col [H] failed to disclose his attendance at such a meeting.

> Col [H] relayed the findings of the meeting and his interpretation of the Commander's intent to a junior officer under his command. Capt. [N] is prepared to give testimony regarding his knowledge of the meeting and the impact it had on Col [H].

> The failure of Col [H] to fully disclose his knowledge of such a critical fact is reversible error. The transcript pertaining to Col [H's] answers to voir dire questions regarding this subject clearly demonstrates that he mislead [sic] the court in believing he had no relevant knowledge or information.

The convening authority responded individually to each of civilian defense counsel's requests for a posttrial Article 39(a) session, and he denied all of them on the basis that the allegations were "unsubstantiated." The Court of Criminal Appeals agreed that the allegations were unsubstantiated. Concerning the command influence allegations, the court found that there was no evidence that such a meeting occurred and, even if one had occurred, no voir dire questions were posed that should have prompted Lt Col H to bring the matter up. 46 MJ at 510.

The court further explained that the convening authority had no obligation, under the circumstances, to develop evidence to support appellant's allegations. The court felt that appellant had ample opportunity to support his accusations of misconduct by Lt Col

---

3. UCMJ, 10 USC § 839(a).

H, but he had failed to do so. Accordingly, the court ruled that the convening authority did not abuse his discretion by denying the request predicated solely on the basis of unsworn, unsubstantiated assertions. *Id.*

 RCM 1102(b)(2) allows a convening authority to convene a posttrial Article 39(a) session "for the purpose of inquiring into, and, when appropriate, resolving any matter which arises after trial and which substantially affects the legal sufficiency of any findings of guilty or the sentence." The convening authority can take this action any time before he takes initial action on the case, or at such later time as he is authorized to do so by a reviewing authority. When an appellant requests the convening authority to order a posttrial Article 39(a) session, it is a matter for the convening authority's sound discretion whether to grant the request.

The existence of factual support for a posttrial Article 39(a) session might persuade the convening authority to consider whether further inquiry is appropriate. Needless to say, he is not compelled to do so based merely on unsworn, unsubstantiated assertions. We agree that the convening authority did not abuse his discretion in not ordering a posttrial Article 39(a) session to consider the defense's allegations.

## IV

### DECISION

The decision of the United States Air Force Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for submission to a convening authority for further proceedings, with both the prosecution and defense present and participating, for a determination of whether the prosecution's reasons for exercising its peremptory challenge against Major H were gender-neutral. After such proceedings are concluded, the record, along with the judge's findings and conclusions, will be returned directly to this Court.

Judges GIERKE and EFFRON concur.

SULLIVAN, Judge (dissenting):

I agree with the lead opinion that "gender, like race, is an impermissible basis for exercise of a peremptory challenge by either the prosecution or the military accused." *United States v. Witham*, 47 MJ 297, 298 (1997); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Nevertheless, the more particular question in this case is whether the 1997 extension of the *"per se* rule" of *United States v. Moore*, 28 MJ 366 (CMA 1989), to gender challenges in *United States v. Witham, supra*, should be retroactively applied to appellant's 1995 court-martial. I agree with the majority opinion's recognition of *Witham*, but I disagree with its decision to apply that extension of the *Moore* rule retroactively in appellant's case.

*United States v. Moore, supra*, represents a departure from Supreme Court practice because it requires no *prima facie* showing of an intent to discriminate by a party before that party is required to provide a race-neutral explanation for its peremptory challenge. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This unique holding was expressly found by this Court to apply to peremptory challenges based on race in *Moore's* court-martial and "after today," meaning the date of the *Moore* decision (August 10, 1989). Extending the *"per se"* rule of *Moore* to gender-based challenges in *United States v. Witham, supra*, should be similarly applied to *Witham* and cases tried "after today," or after the date of the *Witham* decision (Sept. 30, 1997). It should not be applied to appellant's case in 1995 without some analysis based on retroactivity principles. The lead opinion's approach of absolving the parties of any error in failing to anticipate today's decision, but nonetheless applying *Moore's* extension to appellant's court-martial does not satisfy that need.

Finally, I also disagree with the majority opinion's application of *United States v. Ginn*, 47 MJ 236 (1997), to justify its remand action in appellant's case. That decision addressed the procedure required to resolve material disputes of fact created by

competing posttrial affidavits. There are no competing affidavits in this case, and trial counsel's explanations for his challenge are uncontroverted and clearly gender-neutral. Accordingly, I would affirm the findings of guilty and sentence in this case. *See also United States v. Arce,* 997 F.2d 1123, 1127 (5th Cir.1993) (failure to dispute race-neutral explanation constitutes waiver on appeal).

### CRAWFORD, Judge (dissenting):

I dissent because the Court makes findings of fact, continues to reject Supreme Court precedent, and fails to consider the impact and consequences of its decision on the military justice system.

### Findings of Fact

The Court takes an unrealistic view of challenges, seemingly making its own findings of fact, and rejects the prosecutor's affidavit[1] setting forth unrebutted, neutral reasons for challenging a court member. *United States v. Ginn,* 47 MJ 236, 248 (1997) (*DuBay* hearing not required when affidavit is factually adequate on its face and not challenged by the opponent). And foremost, "common sense would suggest that the Government would usually wish to keep the only female member on the case of a male accused with a female 'victim.' " *Unit-*

ed States v. Ruiz, 46 MJ 503, 509 (A.F.Ct. Crim.App.1997).

Our review of peremptory challenges must be pragmatic. The majority, in rejecting the affidavit, states that there is a "more powerful" reason for disfavoring occupational-based challenges in the military because of the selection of the court members by the convening authority. 49 MJ at 345. However, this Court has recognized occupation as a basis of challenge for cause.[2]

Additionally, nearly every trial advocacy book recommends that occupation be a factor in determining the profile of the ideal juror.[3]

As the Supreme Court noted in *Swain v. Alabama,* 380 U.S. 202, 220–21, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965):

> The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control.... [T]he peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable [than the challenge for cause].... It is often exercised ... on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people sum-

1. The Supreme Court in *Batson* chose not to prescribe a particular format for the inquiry. *Batson v. Kentucky,* 476 U.S. 79, 99, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ("We decline ... to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges."). Some courts have held that an adversarial hearing is best, but is not required. *See United States v. Tucker,* 836 F.2d 334 (7th Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989). Other courts have permitted evidentiary hearings. *See Andrews v. Collins,* 21 F.3d 612 (5th Cir.1994); *Kelly v. Withrow,* 25 F.3d 363 (6th Cir.1994), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994); *United States v. Gordon,* 817 F.2d 1538 (11th Cir.1987) (evidentiary hearing held in tradition of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)); *see also United States v. Garrison,* 849 F.2d 103 (4th Cir.1988), *cert. denied,* 488 U.S. 996, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988) (affidavits submitted, *ex parte* review of prosecutor's notes allowed, and adversarial hearing held, but no evidentiary hearing).

2. *Compare United States v. Fulton,* 44 MJ 100 (1996) (holding the judge did not abuse discretion refusing to grant a challenge for cause against member because he was a victim of a crime 20 years ago or because another member was a security police officer for the command but with minimal involvement with the local security police), *with United States v. Dale,* 42 MJ 384 (1995) (improper not to grant a challenge for cause against security police officer); *see also Williams v. State,* 507 N.E.2d 997 (Ind. App.1987) (proper for prosecutor to peremptorily challenge social worker who might have a liberal view of sexual behavior which would affect her judgment in a rape case); *Chisolm v. State,* 529 So.2d 635, 638 (Miss.1988) (accepted prosecutor's peremptory challenge against two prospective jurors because they were associated with radio and television statements that broadcast anti-law enforcement programs).

3. *See, e.g.,* R. Carlson & E. Imwinkelried, *Dynamics of Trial Practice: Problems and Materials* 74 (1995) (2d ed.1995); M. Fontham, *Trial Technique and Evidence* 52 (1995); T. Mauet; *Trial Techniques* 29 (4th ed.1996).

moned for jury duty. For the question a prosecutor or defense counsel must decide is not whether the juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be.

(Citations and footnotes omitted.)

Even when the Supreme Court overruled the allocation of burdens of production applied in *Swain* on a race-based peremptory challenge, it paid some homage to the important role which peremptory challenges have traditionally played in our trial system. *Batson v. Kentucky*, 476 U.S. 79, 98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ("While we recognize, of course, that the peremptory challenge occupies an important position in our trial procedures...."). In fact, only Justice Marshall, in his concurrence, advocated abolishing peremptory strikes from our trial system altogether. *Id.* at 102–03, 106 S.Ct. 1712. Thus, it would appear that the Court is interested in refining the peremptory challenge to conform with the Equal Protection Clause of the Fourteenth Amendment, while maintaining the challenge as separate from the challenge for cause.

The pattern that the Supreme Court has pursued in its consideration of peremptory challenge issues since *Batson* supports this proposition. It has carefully chosen "cognizable" groups, or those "capable of being singled out for differential treatment," and carved them out of the peremptory challenge rule as impermissible bases for making such a challenge. *Batson*, 476 U.S. at 94, 96, 106 S.Ct. 1712. In *Batson*, for instance, that group was African–Americans, a cognizable group based on race. Later, it was a cognizable group based on gender, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and ethnicity, *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). There is no such groundbreaking case for occupation.

The occupation, especially of a court member, does make a difference. Ask any prosecutor or defense counsel if they had a choice between an individual with a troop command, a logistic command, or an administrative post, whom they would like to sit. The an-

swers from both would be obvious. This is borne out by the rules on implied bias and the importance of commanders as members; the division on this Court on that issue has been evidenced. *United States v. White*, 48 MJ 251 (1998), and *United States v. Upshaw*, 49 MJ 111 (1998).

### Rejection of Supreme Court Decisions

This Court has rejected the three steps set forth in *Batson*, refused to apply soft data as permitted by *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), and now rejects an approach taken by many federal courts to allow parties to submit their neutral reasons for a peremptory challenge—made at trial but unarticulated—by affidavit in a later proceeding. *See McCrory v. Henderson*, 82 F.3d 1243 (2d Cir.1996); *Duarte v. United States*, 81 F.3d 75 (7th Cir.1996); *Kelly v. Withrow*, 25 F.3d 363 (6th Cir.1994); *United States v. Cartlidge*, 808 F.2d 1064 (5th Cir.1987). These reasons, plus the failure of the Court in *United States v. Moore*, 28 MJ 366 (CMA 1989), to examine the historical backdrop to *Swain v. Alabama, supra*, call for reexamination of *Moore* and certainly not retroactive application of it. Additionally, since *Moore*, the Supreme Court has extended *Batson* to civil suits, *Edmonson v. Leesville Concrete*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and has held that gender constitutes an improper basis for a peremptory challenge, *J.E.B., supra*. Before long, *Batson* will presumably be further extended to include religion, national origin, and other classifications. But the Supreme Court has not done so yet; and we should not be so presumptuous as to do so first and extend *Moore* when no compelling interests have been presented to us.

### Historical Backdrop

*Moore* failed to examine the history of peremptory challenges in the military. At both general and special courts-martial, the enlisted defendant has the option of electing trial by judge alone, trial by officer members, or trial by officer and enlisted members. Arts. 16 and 25, Uniform Code of Military Justice, 10 USC §§ 816 and 825. A general court-martial is composed of at least 5 mem-

bers, and a special court requires at least 3 members. *Id.*

Courts-martial in the United States date back to Colonial times. Lamb, *A Court–Martial Panel Selection Process: A Critical Analysis*, 137 Mil.L.Rev. 103, 115 (1992). But the peremptory challenge was introduced to the military justice system much later, at a time when Congress wanted to bring the rights afforded a military accused in line as much as possible with those in the civilian community. Prior to 1950, neither the trial or defense counsel in the Navy could exercise a peremptory challenge. *See United States v. Holley*, 17 MJ 361, 366 n. 4 (CMA 1984). The same was true in the Army for courts that were convened prior to 1920. Articles of War, 1920, Art. 18, Act of June 4, 1920, Pub.L. No. 66–242, 41 Stat. 759, 787. However, Congress codified the right to a peremptory challenge when it enacted the Uniform Code of Military Justice in 1950. Act of May 5, 1950, Ch. 169, 64 Stat. 107. Under the Code today, each side may exercise one peremptory challenge, Art. 41(b), UCMJ, 10 USC § 841(b), and both sides have unlimited challenges for cause, Article 41(a). Specific grounds for the latter are set forth in the Manual, along with a catchall clause, RCM 912(f), Manual for Courts–Martial, United States (1995 ed.).

Furthermore, this Court has emphasized on numerous occasions that there should be a liberal-grant rule, *United States v. White*, 36 MJ 284, 287 (CMA 1993), and has even adopted implied bias as a basis of a challenge for cause. *See, e.g., United States v. Minyard*, 46 MJ 229 (1997).

Nor did *Moore* examine the history behind peremptory challenges in the United States that eventually led to *Batson*. After reconstruction, racial discrimination continued in the South by the use of restrictive laws as to jury qualification. *See, e.g.,* Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective*, 64 U. Chi. L.Rev. 809, 827–28 (1997). Even after emancipation, there were a number of so-called "black codes" that contained racial barriers. *Id.* The Supreme Court struck down laws excluding racial minorities from jury service.

*Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880). Yet, despite the striking down of these laws, peremptory challenges continued to be used to prevent racial minorities from sitting on juries. In both *Swain v. Alabama* and *Batson v. Kentucky*, the prosecutors' use of peremptory challenges—six in *Swain* and four in *Batson*—eliminated all African–Americans from sitting on the jury.

This pattern of using peremptory challenges to prevent minorities from sitting on juries, which is the basis for a *prima facie* case under *Batson*, could not exist in the military because each side is limited to a single peremptory challenge.

This Court's rejection of *Batson* is partially based on the assumption that the convening authority will exercise unlimited peremptory challenges and that the convening authority and staff judge advocate have improper motives with regard to the selection of members. *See, e.g., United States v. Witham*, 47 MJ 297, 304 ("Under these circumstances, the considerations that led us in *Tulloch* [*infra,*] to impose specific procedural requirements on the Government's representative in responding to *Batson* challenges are not applicable to peremptory challenges made by the defense.") (Effron, J., concurring). Factually, this is incorrect. I am still more bothered by the fact that what began as a presumption in *Swain* that prosecutors act faithfully in fulfilling their duties as officers of the court has become a presumption that military prosecutors act as part of a conspiracy to pack court panels or fix courts-martial. *See Swain*, 380 U.S. at 222, 85 S.Ct. 824. Is this an extension of the bad-man theory set forth by Oliver Wendell Holmes in his *The Path of the Law*, 10 Harv.L.Rev. 457, 459 (1897)? Furthermore, legally, there are controls to prevent such actions. This Court has "scrupulously ... demanded that convening authorities adhere to the statutory selection criteria...." *Lamb*, 137 Mil.L.Rev. at 138–48. Additionally, this Court has been vigilant in preventing convening authorities from trying to have an impact on courts-martial.

By extending the *Moore per se* rule to cases of potential gender-based discrimina-

tion, the majority requires the Government to explain nearly every peremptory challenge. Essentially, the Court's pursuit of a vastly restricted peremptory challenge rule eliminates such challenges for the prosecution altogether. So radical a change to the Code should be enacted by Congress or the President.

Since this Court's decision in *Moore*, *Batson* has been extended to apply, regardless of the race of the defendant or the race of the challenged juror, *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), to defense as well as prosecution challenges. *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). These extensions of *Batson* show the shift away from the focus on a defendant's right not to have a prospective juror excluded toward the rights of the jurors themselves. It is important to remember, but often forgotten, that the Supreme Court decided *Batson* based not only on the right of the defendant "to be tried by a jury whose members are selected pursuant to non-discriminatory criteria," *Batson*, 476 U.S. at 85–86, 106 S.Ct. 1712, but also on the right of a citizen to sit as a juror and the importance of promoting "public confidence in the fairness of our system of justice." *Id.* at 87, 106 S.Ct. 1712.

The Code-required selection criteria for court-martial panels in the military justice system contains many checks and balances to eliminate these concerns. A court member's constitutional right to sit on a panel does not need the extra protection that has been granted in *Moore*. Nor does the public confidence require it. *Batson* can be applied *in toto*, without risk to either.

### Impact and Consequences

There are three systems of criminal law in the United States: federal, state, and military. Only the military operates a worldwide system of justice. Others are limited by geographic borders or district borders.

The majority opinion wants to ensure that the protection of rights is tested by the crucible of cross-examination during litigation. And rightfully so. That being the case, the most appropriate time to do that would be at the trial, after the opponent has set forth a *prima facie* case.

Such a hearing immediately after the challenge for cause would ensure that every single member of a racial or gender group is not challenged for an inappropriate reason. Just as the defendant has the right to a fair trial, these individuals have a right to sit and not be excluded on an improper basis. This Court should put the burden on the person claiming that there is an improper use of a peremptory challenge. Yet, the majority rejects that approach.

The facts of this case point out the fallacy of *Moore*, and the Court compounds that error by ordering a *DuBay* hearing, even though the Government's affidavit in this case was received without objection and is to date unchallenged. The Court summarily dismisses both the Government's assertion that an occupation of an individual who sits as a court member can make a difference as to whom a party would like sitting, and the Court of Criminal Appeals's acceptance of that rationale. *See Ruiz*, 46 MJ at 509. And *Moore* requires the party exercising the peremptory challenge to make out a *prima facie* case for ethnic or gender discrimination, thus rejecting the first step in *Batson* and *Purkett*.

This Court should avoid holding that the issue must be litigated at every court-martial. The issue should not be litigated unless the opponent makes out a *prima facie* case at trial, as in this case for gender discrimination. This Court, in rejecting the first step in *Batson*, relied on the Court of Military Review in *Moore*. There are numerous reasons why we should relook at that rationale. That Congress and the President have set forth the criteria for selecting the venire, limiting the discretion of the convening authority, and that they have limited trial counsel to only a single peremptory challenge undercuts *Moore*'s *per se* rule, rather than supports it. There is less room for improper exclusion, rather than more. *United States v. Tulloch*, 47 MJ 283, 286 (1997). Certainly, it is a misnomer to talk about selecting a jury. It is really a question of de-selecting a jury. The fact that the members are select-

ed by a convening authority based on criteria set forth in the Code, rather than supporting the rationale in *Moore,* undercuts it. When the convening authority has chosen a new panel because of "unusual results," *United States v. Redman,* 33 MJ 679 (ACMR 1991), or a subordinate is attempting to stack the court to influence the outcome of a court-martial, the courts have acted to prevent an injustice. *United States v. Hilow,* 32 MJ 439 (CMA 1991).

One might read the majority opinion in this case, and in *Tulloch* and others, and reach the conclusion that there is something sinister about the convening authority appointing court members. But a step back reveals how this system as a whole balances the need for military discipline with justice and the appearance of fairness. The responsibility for leadership and setting the proper tone is with the convening authority, provided there is no unlawful command influence. Congress has shown its trust in the convening authority's judgment; we should not displace it perfunctorily.

One has to wonder why the majority persists with its unquestioning allegiance to *Moore.*