UNITED STATES, Appellee

v.

Samuel LOFTON III, Colonel
U.S. Air Force, Appellant

No. 10-0565

Crim. App. No. 37317

United States Court of Appeals for the Armed Forces

Argued December 13, 2010

Decided February 17, 2011

STUCKY, J., delivered the opinion of the Court, in which BAKER, ERDMANN, and RYAN, JJ., joined.  EFFRON, C.J., filed a separate dissenting opinion.


Counsel


For Appellant:  Captain Nicholas W. McCue (argued); Lieutenant Colonel Gail E. Crawford (on brief); Colonel Eric N. Eklund and Major Anthony D. Ortiz.

For Appellee:  Major Charles G. Warren (argued); Colonel Don Christensen, Captain Joseph J. Kubler, and Gerald R. Bruce, Esq. (on brief).

Military Judge:  William M. Burd


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge STUCKY delivered the opinion of the Court.

We granted review to consider (1) whether Appellant's conviction for engaging in conduct unbecoming an officer and a gentleman by making unsolicited comments of a sexual nature is legally sufficient; and (2) whether the convening authority abused his discretion in failing to order a post-trial hearing pursuant to Article 39(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 839(a) (2006).  We hold that Appellant's conviction is legally sufficient and that Appellant suffered no prejudice by the convening authority's failure to order a post-trial hearing.

I.

At a general court-martial, Appellant pled guilty to eleven specifications of being absent without authority from his place of duty, one specification of being derelict in the performance of his duties, one specification of violating a lawful general regulation (the Joint Ethics Regulation), and seventeen specifications of larceny of money, military property of the United States.  Articles 86, 92, and 121, UCMJ, 10 U.S.C. §§ 886, 892, 921 (2006).  Contrary to Appellant's pleas, court members convicted him of two specifications of conduct unbecoming an officer and a gentleman and two specifications of indecent assault.  Articles 133 and 134, UCMJ, 10 U.S.C. §§ 933, 934 (2006).  The members sentenced Appellant to a dismissal,

confinement for nine years, forfeiture of all pay and allowances, a fine of $14,000, and additional confinement for one year if the fine was not paid.  The convening authority approved the sentence but ordered suspension for three months of the execution of the forfeiture of pay and allowances for the first three months and waived for three months the mandatory forfeitures resulting from his sentence to a dismissal and confinement.  The United States Air Force Court of Criminal Appeals affirmed.  United States v. Lofton, No. ACM 37317, 2010 CCA LEXIS 142, at *17, 2010 WL 2266628, at *5 (A.F. Ct. Crim. App. Apr. 19, 2010) (unpublished).

## II.

In specification 2 of Charge IV, Appellant was convicted of "wrongfully and dishonorably mak[ing] unsolicited comments of a sexual nature to Chief Master Sergeant [RM] . . . which conduct under the circumstances was unbecoming an officer and gentleman."  Appellant asserts that the evidence is legally insufficient to sustain this conviction.

## A.

"This Court reviews questions of legal sufficiency de novo . . . ."  United States v. Harman, 68 M.J. 325, 327 (C.A.A.F. 2010) (citation omitted).  We have adopted the Supreme Court's test in Jackson v. Virginia, 443 U.S. 307, 319 (1979), for determining legal sufficiency -- "'whether, after reviewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Harman, 68 M.J. at 327 (quoting United States v. Mack, 65 M.J. 108, 114 (C.A.A.F. 2007)). This test requires that we "draw every reasonable inference from the evidence of record in favor of the prosecution." United States v. Bright, 66 M.J. 359, 365 (C.A.A.F. 2008) (quotation marks and citation omitted).

The elements of a violation of Article 133 are that: (1) the accused did or omitted to do certain acts; and (2) under the circumstances, these acts or omissions constituted conduct unbecoming an officer and a gentleman. United States v. Conliffe, 67 M.J. 127, 132 (C.A.A.F. 2009); see Manual for Courts-Martial, United States (MCM) pt. IV, para. 59.b. (2008 ed.).

> Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the person as an officer, seriously compromises the officer's character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer. There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer, cadet, or midshipman cannot fall without seriously compromising

the person's standing as an officer, cadet, or
midshipman or the person's character as a gentleman.
This article prohibits conduct by a commissioned
officer, cadet, or midshipman which, taking all the
circumstances into consideration, is thus
compromising.  This article includes acts made
punishable by any other article, provided these acts
amount to conduct unbecoming an officer and a
gentleman.  Thus, a commissioned officer who steals
property violates both this article and Article 121.
Whenever the offense charged is the same as a specific
offense set forth in this Manual, the elements of
proof are the same as those set forth in the paragraph
which treats that specific offense, with the
additional requirement that the act or omission
constitutes conduct unbecoming an officer and
gentleman.

MCM pt. IV, para. 59.c.(2).

An officer's conduct need not violate other
provisions of the UCMJ or even be otherwise criminal
to violate Article 133, UCMJ.  The gravamen of the
offense is that the officer's conduct disgraces him
personally or brings dishonor to the military
profession such as to affect his fitness to command
the obedience of his subordinates so as to
successfully complete the military mission.  Clearly,
then, the appropriate standard for assessing
criminality under Article 133 is whether the conduct
or act charged is dishonorable and compromising as
hereinbefore spelled out -- this notwithstanding
whether or not the act otherwise amounts to a crime.

United States v. Schweitzer, 68 M.J. 133, 137 (C.A.A.F. 2009)

(quotation marks and citations omitted).

B.

In large measure, Appellant relies on this Court's opinion

in United States v. Brown, 55 M.J. 375 (C.A.A.F. 2001), to

support this assignment of error.  Brown was a nurse who made

crude and sexist comments to, and inappropriately touched, three

5

other nurses.  Id. at 378-82.  The government relied on an Air

Force pamphlet to establish the applicable standard of conduct.

Id. at 385.  In overturning the conviction for the crude and

sexist comments, this Court held:

> The rigorous standard in the pamphlet shows that
> it is not merely a civility code for policing the
> workplace.  Only severe conduct with harsh effects
> constitutes sexual harassment under the pamphlet;
> comments or questions that offend one's sensibilities
> and make one uncomfortable do not create a hostile
> work environment under the standard in the pamphlet.
> Appellant's breaches of etiquette may well have
> warranted instruction, counseling or other types of
> administrative corrective action, but his comments did
> not violate the standard relied upon by the Government
> at trial to establish the custom of the Air Force for
> purposes of Article 133.

Id. at 387 (quotation marks and citations omitted).

C.

Chief Master Sergeant (CMSgt) RM, Command Chief for the 82d

Training Wing (82 TRW), testified that Appellant was the

commander of the 82d Training Group.  Shortly after she arrived

at the installation, CMSgt RM thought Appellant was the

"greatest group commander we had."  She attended an Asian-

Pacific breakfast at which leis were handed out to the

attendees.  The airman who greeted her said "let's get you

lei'd," and became embarrassed about it.  CMSgt RM thought it

was funny and recounted the incident before the staff meeting,

which followed the breakfast.  After the staff meeting,

Appellant followed CMSgt RM back to her office and asked if she

needed help with that -- which she took as a double entendre reference to the term "lei'd." She took it as a joke. As Appellant left, he said they should set something up, to which she replied, "'I'll have my assistant call your secretary.'" Later that week, one evening after 8 p.m., Appellant had the command post patch a telephone call through to CMSgt RM's work cell phone. He wanted to continue the previous conversation. CMSgt RM, who was at home, told him that she was working and the conversation ended soon thereafter. He later telephoned her on her personal cell phone, but she noted the number, recognized it as his, and didn't answer the call. She thought the call to her personal cell phone was "creepy," because if he had wanted to discuss work, he could have called her on her work cell phone.

Appellant also sent CMSgt RM e-mails saying they should try to get together. On one occasion, he asked where she lived and whether she wanted him to visit her at home. She declined to give him her address. At other times, during staff meetings, when his Group's performance exceeded that of others in the Wing, he would remark to her that "they can go all night," they are "better than everybody else" and "bigger than everyone else," and "I can go all night."

CMSgt RM was not personally offended by Appellant's comments. Because she worked for Appellant's boss, she was not intimidated by him. Nevertheless, she didn't think his comments

were appropriate and she lost respect for him. Once other allegations had been made against Appellant, she notified her boss of Appellant's conduct. Appellant was convicted of attempting to establish an inappropriate relationship with CMSgt RM and making unsolicited comments of a sexual nature to her, both as conduct unbecoming an officer and a gentleman. We are concerned here with the latter offense only.

D.

Appellant's words cannot be analyzed in a vacuum. Unlike the appellant in Brown, Colonel Lofton was not dealing with fellow officers of equal or nearly equal grades who worked together on a basis of familiarity, and the Government did not rely on an Air Force pamphlet to try to establish that Appellant's conduct was unbecoming. Here, the Government established that Appellant, a senior officer, made these comments as a means to further his attempt to establish a personal and unprofessional relationship with CMSgt RM, an enlisted woman. CMSgt RM lost respect for him as a military officer as a result of his comments. We have no doubt that Appellant's actions disgraced him personally and as an officer such that they compromised his fitness to command and to successfully complete the military mission. Taking the evidence in the light most favorable to the Government, any rational trier of fact could have found beyond a reasonable doubt each of

the elements of the offense of conduct unbecoming an officer and a gentleman.[1]

### III.

### A.

After trial, Ms. King, a victims' advocate who assisted some of the victims in this case, sent an e-mail to other members of the Air Force Sexual Assault Prevention and Response Program (AFSAPRP) community, of which she was a member, describing the trial, the media interest in the trial, and the results. Included was the following passage:

> I sat in for the majority of the testimony, and one of the victim's [sic] had family members sitting in on the full trial. One of the challenges was the family members often relayed testified information in person or via text message to the victims, which was very upsetting to the victims. We rotated victim advocates being with them and sitting in the courtroom to give them accurate feedback.

Trial ended on June 26, 2008. The staff judge advocate (SJA) came into possession of a copy of this e-mail and forwarded it to the defense counsel on June 30, 2008. That same date, the defense requested post-trial discovery of the actual text messages.

The record of trial was authenticated on July 29, 2008. On September 15, 2008, two and one-half months after defense

---

[1] We have no doubt that Appellant had notice that such conduct was an offense under the UCMJ.

counsel's request, the senior trial counsel notified the defense that "the government is not under any obligation to produce these messages, or any other potential evidence regarding these text messages." Unless the text messages were in the custody or control of the Government, the trial counsel did not have an obligation to produce them. R.C.M. 701(a)(2).

On September 19, 2008, four days after the senior trial counsel denied the discovery request, the defense counsel submitted a request to the convening authority to order a post-trial Article 39(a) hearing, asserting that when she had

> asked [Ms. King] to provide the information, she was non responsive. Therefore, we are asking you to empower a military judge to convene a post-trial Article 39(a) session to determine what happened in the courtroom. . . . Because Ms. King has chosen to be evasive, we must avail ourselves to the court, again.

Appellant suggests in his brief that the convening authority might not have seen the request for the post-trial Article 39(a) hearing or the e-mail from Ms. King. The record does not contain any evidence that the convening authority either saw the request for the post-trial Article 39(a) session or that he ever formally denied it. But the convening authority was aware of the issue from both the clemency matters Appellant submitted and from the Addendum to the Staff Judge Advocate's Recommendation. By taking action without granting the motion, it is clear the convening authority decided not to grant Appellant's request.

10

B.

When asked, a military judge shall exclude witnesses from the courtroom "so that they cannot hear the testimony of other witnesses." Military Rule of Evidence (M.R.E.) 615. "The purpose of the sequestration rule is to prevent witnesses from shaping their testimony to match another's and to discourage fabrication and collusion." United States v. Miller, 48 M.J. 49, 58 (C.A.A.F. 1998), quoted in United States v. Langston, 53 M.J. 335, 337 (C.A.A.F. 2000). Appellant did not request sequestration of witnesses.

The Air Force has a stronger rule: "Prospective witnesses will not be present in the courtroom during proceedings except upon agreement by both sides and approval of the military judge, or as otherwise required by law." Uniform Rule of Practice Before Air Force Courts-Martial 6.4(C) (Oct. 18, 2006).[2] There is no evidence that the parties had agreed to, or the military judge had approved, lifting the sequestration rule. The purpose of the Air Force sequestration rule appears to be the same as that of M.R.E. 615 -- "to prevent witnesses from shaping their testimony . . . and to discourage fabrication and collusion." Miller, 48 M.J. at 58. Court-martial spectators should not

---

[2] TJAG Policy Memorandum: TJAGC Standards -- 3, Air Force Standards for Criminal Justice, Attachment 2 (May 15, 2005). The current Rule 6.4(C) (Feb. 1, 2009) remains the same.

11

provide summaries of testimony to sequestered witnesses, and the parties and the military judge should be vigilant in preventing such incidents.

C.

Post-trial hearings may be convened, for, among other things, "the purpose of inquiring into, and, when appropriate, resolving any matter that arises after trial and that substantially affects the legal sufficiency of any findings of guilty or the sentence." R.C.M. 1102(b)(2). The military judge may direct a post-trial session at any time before authenticating the record. R.C.M. 1102(d); Denedo v. United States, 66 M.J. 114, 124 (C.A.A.F. 2008), aff'd, 129 S. Ct. 2213 (2009); see United States v. Williams, 55 M.J. 302, 304 (C.A.A.F. 2001). The convening authority may direct a post-trial hearing at any time before taking initial action. R.C.M. 1102(d); United States v. Ruiz, 49 M.J. 340, 348 (C.A.A.F. 1998). By the time Appellant asked for a post-trial hearing, the military judge had already authenticated the record and, without direction from an authorized reviewing authority, was without jurisdiction to conduct a post-trial hearing. R.C.M. 1102(d).

We review a convening authority's decision not to grant a post-trial hearing for an abuse of discretion. See Ruiz, 49 M.J. at 348. A convening authority is "not compelled to" grant

12

a post-trial hearing "based merely on unsworn, unsubstantiated assertions." Id. This is not such a case.

D.

The Government contends that this appeal must fail because Appellant's allegation is based on an unsworn and unsubstantiated e-mail. Ms. King's e-mail was somewhat vague; it does not mention which witnesses or which family members were involved or if it occurred during findings, sentencing, or both. The defense counsel's assertion that she made an attempt to interview Ms. King is similarly vague. There is no explanation of what the defense counsel said or what Ms. King's response was, other than to characterize it as "non responsive" and "evasive," whatever those terms signify here. Nor is there any evidence that the defense counsel asked the SJA or command for assistance in getting a more definitive statement from Ms. King to augment the vague e-mail. Although Ms. King did not work locally, she was an Air Force employee and, therefore, subject to direction by Air Force officials to cooperate in any investigation.

In Ruiz, the appellant asserted that at least one of the court members was subject to unlawful command influence. 49 M.J. at 347. This Court was unwilling to conclude that the convening authority abused his discretion in denying a request to order a post-trial hearing when there was nothing but the

"unsubstantiated," unsworn statement of the civilian defense counsel to support this claim. Id. at 348.

Appellant's case is different. The basis of his claim is an unsworn e-mail from an Air Force employee, not from one of the parties or a disgruntled witness. It was part of an official communication describing the court-martial to other members of the AFSAPRP community. Under all the circumstances, we conclude that the defense claim is not unsubstantiated, and the convening authority abused his discretion in not ordering a post-trial hearing to determine whether there was reason to inquire into Ms. King's allegations and its effect, if any, on Appellant's court-martial.

E.

Prejudice under the sequestration rule of "M.R.E. 615 is determined by considering whether the witness's testimony was affected by the trial proceedings that the witness heard." United States v. Quintanilla, 63 M.J. 29, 38 (C.A.A.F. 2006). We see no reason to employ a different rule for sequestration required by rules of court.

Three female witnesses testified against Appellant at trial -- CMSgt RM, DM, and PP, in that order. DM was also called to testify for the defense, but this testimony was limited to attempts to impeach her credibility. During this second testimony, the defense attempted to show DM lied during

14

her previous testimony concerning whether she had hired an attorney and had filed an Equal Employment Opportunity (EEO) complaint. DM's testimony remained consistent with her testimony for the prosecution.

Each of the three victims testified to her own private relationship with Appellant. CMSgt RM was the first to testify and so could not have shaped her testimony based on the testimony of DM or PP. Nor did she accept victim assistance, so it is unlikely that her friends or family were involved or that she could have benefited. Although it is not clear, it appears Ms. King's e-mail was referring to the family and friends of DM, PP, or both.

As Appellant was acquitted of all charges involving PP, no prejudice could have occurred with respect to her testimony. Thus, we are left to evaluate whether DM's testimony was shaped by CMSgt RM's testimony on direct or by PP's testimony when DM was recalled to testify by the defense. It is unlikely that DM's testimony was shaped by CMSgt RM's testimony: the incidents were distinct, there is no evidence of any kind of relationship between the two, and a review of the testimony does not provide any basis for concluding that shaping of testimony or collusion occurred.

The relationship between PP and DM's testimony is harder to evaluate, as they shared the same attorney and had discussed

15

filing an EEO complaint against Appellant and possibly taking other civil action. Nevertheless, DM's testimony after PP testified is remarkably similar to her testimony before PP testified and not very congruent with that of PP. Contrary to PP, DM insisted that she had not filed a formal EEO complaint and that unless and until she did so, she would not be hiring the attorney she and PP had consulted. DM's testimony was not shaped by PP's testimony. Under these circumstances, we hold that Appellant was not prejudiced.[3] Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2006); Quintanilla, 63 M.J. at 38.

IV.

The judgment of the United States Air Force Court of Criminal Appeals is affirmed.

---

[3] The dissent suggests that we have unduly presumed "that the messages would have contained nothing more than a description of the testimony offered in the courtroom" and that without a post-trial hearing, we are unable to divine whether the messages contained other evidence of collusion. United States v. Lofton, __ M.J. __ (4) (C.A.A.F. 2011) (Effron, C.J., dissenting). We engage in no such presumption. Appellant's allegation is that the testimony was affected by the text messaging. We have determined on the basis of the record that it was not.

<u>United States v. Lofton</u>, No. 10-0565/AF

EFFRON, Chief Judge (dissenting):

At trial, the defense contended that two of Appellant's accusers, DLM and PP, collaborated to fabricate allegations of sexual assault by Appellant. The defense focused on evidence that the two regularly conversed about Appellant, shared information about the allegations in the course of preparing administrative requests for financial compensation based upon the alleged incidents, and did not report the alleged incidents until they became coworkers. Although the panel returned a verdict of not guilty on the charges pertaining to PP, Appellant was convicted of the charges involving DLM.

Shortly after the conclusion of Appellant's court-martial, the Staff Judge Advocate (SJA) forwarded to defense counsel an e-mail by Barbara King, Chief of the Sheppard Air Force Base Sexual Assault Prevention and Response Office, containing observations about the trial. The e-mail included the following comment:

> One of the challenges was the family members often relayed testified information in person or via text message to the victims, which was very upsetting to the victims [sic]. We rotated victim advocates being with them and sitting in the courtroom to give them accurate feedback.

The defense immediately sent a brief reply to the SJA:

> This is obviously a huge deal. We are requesting post-trial discovery for those actual text messages as well as have the government talk to the family members in question to find out what

> was said.  Having witnesses informed about
> anything that happened in that courtroom before
> they testified certainly could have played a part
> in influencing their testimony and effected [sic]
> our client's right to a fair trial.

In a message rejecting the defense request, the senior trial counsel stated that "the government is not under any obligation to produce these messages, or any other potential evidence regarding these text messages."  The defense then formally requested the convening authority to convene a post-trial session so that a military judge could obtain and consider the pertinent information under Article 39(a), Uniform Code of Military Justice, 10 U.S.C. 839(a) (2006).  The defense emphasized the relationship of the request to the defense position at trial that "the complaining witnesses were colluding."  The defense asked the convening authority to assist "in finding out just who was sending texts and what those texts were about."  The defense took the position that it would have been improper for the witnesses to have remained in the courtroom during the testimony, and that the receipt of the testimony by unauthorized means also would have been improper.

Shortly thereafter, the defense submitted a formal clemency request to the convening authority that included a discussion of the defense request for a post-trial hearing.  The defense noted that the request for a hearing had been based upon "further evidence of collusion in the courtroom."  The defense further

stated that the information about the e-mail was "troubling, because if it happened, it gave the witnesses a chance to change their testimony in light of the reported happenings in the courtroom." Defense counsel reminded the convening authority that "the ramifications of this on the trial we aren't able to explore without the intervention of the military judge, or you." In a concluding comment, defense counsel stated, "If there is any doubt these women colluded, it can be resolved in this hearing."

The SJA's post-trial recommendation to the convening authority stated: "The defense does not allege any legal errors." The SJA also offered the following brief reference to the post-trial developments matters: "The defense also states they requested evidence after the trial and the request was denied by the government." The SJA did not discuss the substance of the defense request, the rationale for denying the request, or the subsequent defense request for a post-trial hearing before a military judge. The convening authority, in taking action on the case, did not address the defense request.

I agree with the majority that "the convening authority abused his discretion in not ordering a post-trial hearing to determine whether there was reason to inquire into" the allegations in the e-mail and the "effect, if any, on Appellant's court-martial." United States v. Lofton, ___ M.J.

___ (14) (C.A.A.F. 2011).  I respectfully disagree with the majority's conclusion that the error did not prejudice Appellant.  The majority grounds its conclusion upon a determination that the witnesses' testimony was not affected by the texting.  Id. at ___ (16 n.3).  The majority's conclusion presumes that the messages would have contained nothing more than a description of the testimony offered in the courtroom.  In the absence of a post-trial hearing, however, we do not know the content of any such messages.  We do not know whether such messages conveyed accurate or inaccurate information about the trial proceedings; nor do we know whether the messages contained views, recollections, or references to earlier developments that could have supported and strengthened the defense theory of improper collusion by Appellant's accusers.

The treatment of the defense request by the trial counsel, the SJA, and the convening authority leaves unresolved the question of whether the messages were neutral in content or supportive of the defense theory of the case.  The defense identified the problematic nature of the messages on June 30, 2008, just four days after trial, providing the Government with an early opportunity to resolve the factual and legal consequences in a prompt and effective manner.  See United States v. Meghdadi, 60 M.J. 438, 444-45 (C.A.A.F. 2005) (explaining that one of the purposes of a post-trial Article

4

39(a) session is to discover and preserve "evidence at the earliest possible time . . . while still relatively fresh in the witness' memory") (quotation marks omitted).

During the nearly three-month period between the defense request and the convening authority's action on September 29, 2008, the Government treated the defense request in a peremptory fashion, with the result being that the record on appeal does not even contain a response by the convening authority to the defense request for a post-trial Article 39(a) session. Before acting on this case, the Court of Criminal Appeals should have returned the record of trial to the convening authority with direction that a post-trial session be ordered to determine whether any messages were sent, to ascertain the content of any such messages, and to assess the impact of any such messages on Appellant's court-martial. At this stage, we should set aside the decision of the court below and return the case to the convening authority for a post-trial Article 39(a) session. I respectfully dissent from the majority's decision to affirm the findings and sentence without ordering such a proceeding.